## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

Filed/Docketed
Jan 04, 2013

IN RE:

**GEORGE DAVID GORDON, JR.,**

**Case No. 11–10045-M**
**Chapter 7**

**Debtor.**

### MEMORANDUM OPINION

Most litigation deals with past events. Bankruptcy cases often focus on the future. It may be the future of a reorganized business, or the collection and distribution of a debtor's assets. Just as disputes arise out of past events, they can also be foreseen. The question before the Court is whether potential disputes may be the proper subject of compromise, and, if so, whether the compromise presented in this case should be approved. The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52, which are made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 9014.

### Jurisdiction

The Court has jurisdiction over this bankruptcy case pursuant to 28 U.S.C. § 1334(b).[1] Reference to the Court of the bankruptcy case is proper pursuant to 28 U.S.C. § 157(a). The approval of a compromise constitutes a core proceeding as defined by 28 U.S.C. § 157(b)(2)(A).

---

[1]  Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*.

**Findings of Fact**

George David Gordon, Jr. ("Debtor" or "Gordon") filed a petition for Chapter 7 relief on January 7, 2011. Patrick J. Malloy III ("Malloy" or "Trustee") has been appointed to serve as Trustee. Malloy has filed a preliminary report indicating that assets may be available for distribution to creditors in this case.[2] A deadline for filing claims has been established.[3] Commerce Bank ("Commerce" or "Bank") filed a proof of claim in the amount of $470,200, based upon a guaranty of indebtedness executed by Gordon.[4] The United States of America ("USA") filed a claim against Gordon in the amount of $43,609,877.44.[5]

Debtor is incarcerated in a Federal Correctional Facility in Texarkana, Texas. He was convicted of conspiracy to commit securities fraud, wire fraud, and money laundering by the United States District Court for the Northern District of Oklahoma (the "District Court"). His crime has been described as a "pump and dump" stock scheme (or series of schemes).[6] There are somewhere between 17,000 and 19,000 possible investors in the Debtor's schemes that have or may have lost money (the "Investors"). The Investors have never been given formal notice of Gordon's bankruptcy case. As part of the criminal proceedings, the USA has commenced forfeiture

---

[2] *Docket No. 84.*

[3] *Docket No. 86.*

[4] *Claim No. 1-1.*

[5] *Claim No. 8-1.*

[6] As the Court understands it, a "pump and dump" stock scheme involves the inflation of stock prices on the basis of false or fraudulent information (the "pump"), followed by the sale of that stock to unsuspecting investors (the "dump"). The result is that the parties selling the near worthless stock reap huge profits, and the unwitting investors are duped out of large sums of money.

proceedings against Gordon and obtained judgments against him.  These judgments comprise the basis for the USA claim in this case.  Prior to the filing of the bankruptcy case, the USA recovered approximately $3 million from Gordon.

On March 23, 2012, Malloy filed a motion to compel Debtor to amend his schedules to list the Investors as creditors.[7]  The motion questioned whether the Investors received proper notice of this bankruptcy case, and sought to require the Debtor to bear the cost of providing such notice.  Four days later, without explanation, Malloy attempted to withdraw this motion.[8]  Concerned by Malloy's  allegations regarding lack of proper notice to the Investors, the Court scheduled a status hearing regarding the motion for April 10, 2012.  The hearing was continued twice at Malloy's request and was ultimately held on May 23, 2012.  At the hearing, Malloy informed the Court that he was nearing a settlement with the USA that would provide a means of allowing the Investors to participate in any distribution from the bankruptcy estate.

On May 25, 2012, Malloy and the USA filed a pleading entitled "Amended Trustee's Notice and Motion to Settle Disputed Matter" (the "Motion to Settle").[9]  In the Motion to Settle, Malloy advised the Court that he had entered into a "Coordination Agreement" (the "CA") with the USA.[10]  Under the terms of the CA:

1.      Malloy shall not contest the forfeiture of certain properties once owned by the Debtor  to the USA;

---

[7]  *Docket No. 156*.

[8]  *Docket No. 158*.

[9]  *Docket No. 169.*

[10]  *Exh. A.*

2.      The USA shall not seek a prior interest in any assets recovered by Malloy for the

benefit of the estate;

3.      The USA shall assign to Malloy any claims it has against third parties for aiding,

abetting, and/or conspiring with Debtor;

4.      The USA shall provide notice to the Investors of their right to participate in

recoveries in either the bankruptcy and/or the forfeiture proceedings at no cost to

Malloy or the Gordon estate;

5.      All of the Investors are to be provided an opportunity to assign all claims they may

have against third parties for aiding and abetting Debtor in his "pump and dump"

scheme.

Malloy and the USA jointly seek court approval of the CA.

The CA has been properly noticed to all creditors, but not to the Investors.  Originally, three objections were filed: one by Debtor, one by Amy Gordon, Debtor's spouse; and one by Commerce. The objection by the Debtor was denied for lack of standing.  The objection of Amy Gordon has been settled.  Only the Commerce objection remains.[11]  Commerce objects to the CA on various bases, including: (1) the CA does not adequately describe the nature of the dispute being settled; (2) it "does not promote the integrity of the judicial system" because it provides for the assignment of claims held by the Investors and the USA to Malloy; and (3) the assignments of claims contemplated in the CA are prohibited as a matter of law.  The United States Trustee supports approval of the CA.

Commerce is not merely a creditor in this case.  Malloy alleges that Commerce is the beneficiary of a $1.7 million fraudulent transfer from Gordon.  He also contends that Commerce

---

[11]  *Docket No. 181.*

4

aided and abetted Debtor in his pump and dump scheme.  Malloy claims that Commerce's liability for this misconduct is in the millions of dollars.  Commerce and its attorneys are aware of Malloy's allegations, and furiously contest them.  Malloy intends to commence litigation against Commerce on or before January 7, 2013.[12]

A hearing on the Motion to Settle was held on October 25, 2012.  Malloy was the only witness.  He testified that the CA provides the following benefits to the bankruptcy estate:

1. The recognition of parallel proceedings between the USA and the bankruptcy estate, both with the common goal of maximizing return to creditors of Gordon, including the Investors;

2. The elimination of future litigation between the USA and Malloy regarding assets to be collected by the bankruptcy estate;

3. The assignment of additional claims to the bankruptcy estate that could result in additional distribution to its creditors;

4. A viable method of providing notice to the Investors of their opportunity to recover monies lost through Debtor's pump and dump scheme at no cost to the bankruptcy estate;

5. The assurance of future cooperation between Malloy and the USA in collection efforts; and

6. The comfort of knowing that, to the extent possible, all Investors have been given notice of their rights.

Malloy and the USA contend that these considerations are sufficient to justify approval of the CA.

---

[12] *Docket No. 327.*

An important component of the CA involves notification to Investors that they "may but are not required to assign to [Trustee] any claims they may have against third parties relative to losses sustained as a result of the described conspiracy and schemes" (the "Assigned Claims").[13]   The assignment is found on the Petition Form submitted to Investors as part of the remission process in the criminal and civil forfeiture cases of *United States v. Gordon et al.*, Case No. 08-CR-133-CVE, and Case No. 09-CV-013-JHP, in the District Court.[14]

The Petition Form is not a model of clarity.  For example, in the notice sent to Investors they are told that

> [i]f you submit a Petition Form, you do not give up any rights to sue the defendants or any third parties.  However, you have the option to assign such claims against the debtor or third parties to the Bankruptcy Trustee in the bankruptcy case (*In re George David Gordon*, United States Bankruptcy Court for the Northern District of Oklahoma, Case 11-10045-M).  If you assign such claims against the debtor or third parties, the Bankruptcy Trustee will pursue the claims at no cost to you for the benefit of all creditors of the estate. . . . The United States will seek forfeiture of any net proceeds recovered by the Bankruptcy Trustee on behalf of the victims.  Upon forfeiture, such proceeds will be distributed to victims who qualify under the remission regulations (28 C.F.R. part 9.8).[15]

The assignment language reads as follows:

> By checking this box, I (we) assign my (our) claims against George David Gordon or third parties to the Bankruptcy Trustee in the matter of *In re George David Gordon*, United States Bankruptcy Court for the Northern District of Oklahoma, Case 11-10045-M.  The Bankruptcy Trustee will pursue my (our) claims at no cost to me (us) for the benefit of the estate.  I understand that this assignment is optional and is not required for me to receive remission.[16]

---

[13]   *Exh. A,* ¶ 5.

[14]   *Exh. C.*

[15]   *Id.*

[16]   *Id.*

Under this language, it is unclear whether all of the funds recovered by Malloy would be paid to the Investors (i.e., whether the USA would seek forfeiture of all monies collected or the monies would be distributed to all creditors on a pro rata basis). The use of the term "at no cost to you [the Investor]" is also unclear. It could be interpreted to mean that Malloy will seek recovery of these funds at "no cost" (*pro bono*) or at "no out of pocket cost" (i.e., the Investors will not be required to advance monies for payment of fees or expenses). Given that Malloy has previously sought a contingency fee of forty per cent in other litigation he has brought for the benefit of the estate, the difference is significant.

The process of providing notice to the Investors began prior to the Court's consideration of the CA, and perhaps even prior to its existence. As of the date of the hearing, approximately 14,467 Investors had been given notice of their right to seek recovery from the USA through a process called remission. The best evidence submitted to the Court shows that not less than 2,424 petitions for remission had been received by the USA as of July 16, 2012.[17] Approximately 1,110 Investors assigned their claims against third parties (including Commerce) to Malloy. The dollar value of the Assigned Claims is estimated at $7,000,000. Although there have been additional petitions for remission and additional assignments since July 16, 2012, the exact number of petitions and/or amount of claims assigned is not part of the record.

Malloy and the USA ask that the order approving the CA include a ruling that any assignment made by an Investor provides Malloy with standing to litigate the Assigned Claims. The Court has questioned the need for such a ruling throughout this contested matter. Malloy has not

---

[17] *Exh. CB-17.*

provided the Court with a specific delineation of the type or nature of the Assigned Claims.[18]  He

asserts that all assignments are valid regardless of the source or nature of the causes of action at

issue.  Commerce has asked this Court to rule that the assignments to Malloy are invalid.[19]  In

addition to various technical objections to the solicitation and wording of the Assigned Claims,

Commerce asserts that the assignment of claims from the Investors to Malloy is prohibited under

Oklahoma law, and therefore Malloy lacks standing to prosecute those claims.  In the alternative,

Commerce asks the Court to make no ruling regarding Malloy's standing to prosecute the Assigned

Claims, instead leaving that issue to the court where such litigation is brought.

To the extent the Conclusions of Law contain any items that should more appropriately be

considered Findings of Fact, they are incorporated herein by this reference.

### Conclusions of Law

A court's inquiry in deciding whether to approve a compromise is limited.[20]  In evaluating

a proposed compromise or settlement, it is the court's duty to make an "informed [decision] based

---

[18]  Although it appears Trustee has provided Commerce with some information regarding
potential causes of action, the same was not made part of the record in this contested matter.
Trustee included a draft complaint as an attachment to a Motion for Sanctions against
Commerce. *See Docket No. 290*, Exhibit B. According to Trustee, the same draft complaint was
entered into evidence during a hearing before this Court to consider a proposed settlement with
Debtor's spouse. *Id.* at 8.  Neither bring the issue sufficiently before the Court.

[19]  Commerce filed an adversary proceeding seeking a declaratory judgment that the
purported assignments are invalid under Oklahoma law and do not serve to grant standing to
Trustee with respect to the Assigned Claims.  Trustee is adamant that these issues can be dealt
with in the pending matter.  The Court agrees.

[20]  The issue before the Court is approval of the CA. We are not here to consider the
claims made by Malloy against Commerce.  Whatever those claims may be, they are not at issue
today.

8

upon an objective evaluation of developed facts."[21]  Courts have developed factors for consideration

of whether to approve settlements.  In general, the court must determine whether the settlement is

fair and equitable, and in the best interest of the estate.[22]  In considering whether a settlement or

compromise is fair and equitable and in the best interest of the estate, a court should ordinarily

consider these four items:

> (1)    the probable success of the underlying litigation on the merits;
>
> (2)    the possible difficulty in collection of a judgment;
>
> (3)    the complexity and expense of litigation; and
>
> (4)    the interests of creditors in deference to their reasonable views.[23]

In most cases, a bankruptcy court should show deference to a trustee as it considers the beneficial

nature of a proposed settlement. The court should evaluate whether a trustee's actions are "within

the universe of reasonable actions," and assess "whether the settlement falls below the lowest point

in the range of reasonableness."[24]  The court is not to substitute its own judgment for that of the

trustee.  In order to function, bankruptcy trustees must be allowed to exercise their judgment in a

reasonable fashion.

Malloy cites cases where courts have approved coordination agreements between bankruptcy

---

[21]  *Reiss v. Hagmann*, 881 F.2d 890, 892 (10th Cir. 1989).

[22]  *In re Kaiser Steel Corp.*, 105 B.R. 971, 976 (D. Colo. 1989).

[23]  *In re Kopexa Realty Venture Co.*, 213 B.R. 1020, 1022 (10th Cir. BAP 1997). *See also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968).

[24]  *In re W.T. Grant, Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (internal citation omitted);  *In re Dennett*, 449 B.R. 139, 145 (Bankr. D. Utah 2011).

trustees and representatives of the United States in various criminal and/or civil forfeiture actions.[25] None of the coordination agreements in those cases included the assignment to a bankruptcy trustee of causes of action from creditors. This distinction renders the cases of limited value. It is interesting to note that in each of the cases cited by Malloy, the parties sought approval of the agreement from both the bankruptcy court _and_ the district court presiding over the forfeiture proceedings.

In this case, any attempt to literally apply the enumerated factors is akin to jamming a square peg into a round hole. There is no pending litigation between Malloy and the USA. The CA does not require the transfer of funds between the parties, so it is impossible for the Court to compare the amount of a proposed settlement against the minimum or maximum amount Malloy could expect to recover in litigation. On the other hand, the Court is convinced that if Malloy and the USA were to go to battle over what assets should be administered through the bankruptcy estate and what assets should be administered through the process of criminal forfeiture, any such litigation would be lengthy, expensive, and problematic for all involved. The Court will therefore focus upon the objection that has been raised, and consider whether the CA is in the best interests of the creditors and the bankruptcy estate.

*Malloy's Standing to Litigate the Assigned Claims*

The point of contention lies not in what is being compromised, but with the mechanics of the compromise. Commerce objects to the assignment of claims to Malloy by any Investor. If there

---

[25] *E.g., United States v. Dreier,* 682 F. Supp. 2d 417 (S.D.N.Y. 2010); *In re Dreier LLP*, 429 B.R. 112 (Bankr. S.D.N.Y. 2010); *United States v. Petters*, Civil No. 08-5348, 2010 WL 4736795 (D. Minn. Nov. 16, 2010); *In re Petters Co.*, 440 B.R. 805 (Bankr. D. Minn. 2010).

were no assignments, there would be no dispute.[26]  The parties agree that what is at issue is not the validity of any particular assignment.  Instead, the question is whether any and all claims of Investors and/or the USA may be assigned to Malloy under the Bankruptcy Code, regardless of their nature, or whether state law might prohibit the assignment of certain types of claims in this case. The question is crucial to the determination of whether Malloy would have standing to prosecute the Assigned Claims in future litigation.

Section 541 of the Bankruptcy Code provides that:

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

* * *

(7) Any interest in property that the estate acquires after the commencement of the case.[27]

Malloy relies on a series of cases that hold *property of the debtor* that becomes property of the estate

---

[26] Counsel for Commerce has proposed that any order approving the CA contain the following language:

Nothing in this Order shall be deemed to be a ruling on the validity of any assigned claim or the validity of any proposed assignment.  Nothing in this Order shall preclude any party from asserting any defense to or argument against any claim which may be asserted against such party by the Trustee, and nothing in this Order shall be deemed to be a ruling upon the validity of any such defense or argument.

*See Docket No. 295* at 2.  At the October 29, 2012, hearing, the Court inquired of counsel for Commerce whether inclusion of this language in an order approving the CA would satisfy the concerns of Commerce.  Counsel for Commerce answered with a simple "yes."

[27]  § 541(a)(1), (a)(7).

pursuant to § 541(a)(1) does so notwithstanding any state law restrictions on such assignment.[28]

While the Court agrees with these decisions, they have little or no application to the case at bar.

There is a vast difference between a pre-petition cause of action held by a debtor and a pre-petition

claim held by a non-debtor. A debtor's assets automatically become property of the estate. The

assets of a creditor or other entity do not. This conclusion is fairly unremarkable given the language

of § 541(c)(1):

> (c)(1) Except as provided in paragraph (2) of this subsection, an interest *of the debtor*
> in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5)
> of this section notwithstanding any provision in an agreement, transfer instrument,
> or applicable nonbankruptcy law—
>
> (A) that restricts or conditions transfer of such interest *by the debtor*; or . . . .[29]

That statute expressly overrides any state law that attempts to restrict *property of the debtor* coming

into the bankruptcy estate through § 541(a)(1), (a)(2), or (a)(5).[30] Malloy is asking the Court to

extend the holding of the cases addressing *property of the debtor* under § 541(a)(1) to the case at

bar, which involves *property of a creditor* being assigned to the estate under § 541(a)(7). By

---

[28] *Sierra Switchboard Co. v. Westinghouse Elec. Corp.*, 789 F.2d 705, 709 (9th Cir.
1986) ("Thus, regardless of whether a personal injury claim is transferable or assignable under
state law, such claims become part of the bankruptcy estate under section 541."); *Ellwanger v.
Budsberg (In re Ellwanger)*, 140 B.R. 891 (Bankr. W.D. Wash. 1992) (property of estate
includes all claims *held by debtor* as of petition date, despite state law prohibition on
assignment); *Cowan v. Fid. Interstate Life Ins. Co.*, 89 B.R. 564, 571 (E.D. La. 1988) ("As the
Ninth Circuit has explained, section 541 of the new Code has broadened the definition of
property that comes within the bankruptcy estate; for determining *if a debtor's property (viz., a
right of action) passes to his bankruptcy estate*, it is no longer relevant whether the property is
assignable or not under state law.") (emphasis added); *In re Cottrell*, 876 F.2d 540 (6th Cir.
1989) (not cited by Trustee, but reaching same conclusion).

[29] § 541(c)(1) (emphasis added). The restriction in paragraph (2) involves the transfer of
the beneficial interest of a debtor in a trust, and is thus inapplicable here.

[30] *See Ellwanger v. Budsberg (In re Ellwanger)*, 140 B.R. 891, 900 (Bankr. W.D. Wash.
1992).

analogy, he is effectively showing the Court an apple, calling it an orange, and asking the Court to find that there is no difference between the two.

Malloy asserts that under § 541(a)(7), all Assigned Claims become property of the estate, and that he has standing to litigate those claims for the benefit of the estate.  He cites to cases that have so held.[31]  Each of those cases differ from the case at bar in two very important ways:  1)  in each case, standing of the trustee was determined within the context of litigation of the assigned claims, and not in the context of approval of a coordination agreement; and 2)  there were no state law prohibitions on the assignments of the claims at issue to stand in the way of them becoming property of the estate.

In *Bankruptcy Services, Inc. v. Ernst & Young (In re CBI Holding Co.)*,[32] a disbursing agent appointed under a confirmed plan filed a complaint as assignee of claims held by a pre-bankruptcy creditor of the debtor.   When the defendant objected, the court found that although acceptance of such assignments was beyond a trustee's authority under the Bankruptcy Act, § 541(a)(7) of the Bankruptcy Code allowed for such an assignment.  The court found that

> [t]he rights of a trustee to accept and protect property after the commencement of bankruptcy proceedings is an issue of federal bankruptcy law; § 541(a)(7) of the Bankruptcy Code permits a trustee (or equivalent) to assert claims against a third party that were assigned to the trustee by a creditor of the bankrupt whose shoes it fills.[33]

---

[31]  *Bankr. Servs., Inc. v. Ernst & Young (In re CBI Holding Co.)*, 529 F.3d 432, 454–59 (2d Cir. 2008); *Logan v. JKV Real Estate Servs. (In re Bogdan)*, 414 F.3d 507 (4th Cir. 2005); *Sender v. Mann*, 423 F. Supp. 2d 1155, 1173 (D. Colo. 2006); *Steinberg v. Kendig (In re Ben Franklin Retail Stores, Inc.)*, 225 B.R. 646 (Bankr. N.D. Ill. 1998), *aff'd in part*, 2000 WL 28266 (N.D. Ill. Jan. 12, 2000).

[32]  529 F.3d 432 (2d Cir. 2008).

[33]  *Id.* at 469.

As it ruled, the court in *In re CBI Holding* noted that <u>there was no state law prohibition against the particular assignment of claims</u> in that case.[34]  Similarly, in *Logan v. JKV Real Estate Services (In re Bogdan),*[35] defendants argued that a bankruptcy trustee lacked standing to prosecute causes of action assigned to it by creditors.  In a split decision, a three-judge panel of the United States Court of Appeals for the Fourth Circuit concluded that the trustee had standing under § 541(a)(7) to prosecute such actions.  The dissent expressed concern about the validity of the assignments under state law.  The dissent noted that neither the bankruptcy nor district courts had addressed the assignments' validity, and that the majority assumed they were valid because of the summary nature of the proceeding.[36]  While these cases are informative, they fail to address the question presented here:  whether § 541(a)(7) authorizes a trustee to accept an assignment or transfer of property after the commencement of the case <u>when there may be a restriction on such transfer under state law.</u>

Malloy relies on a single case that held property assigned by a creditor under § 541(a)(7) became property of a bankruptcy estate, notwithstanding a state anti-assignment statute.[37]  The Court finds that *In re Agribiotech* is factually distinguishable from the case at bar.  In that case, defendants filed motions to dismiss a complaint, arguing the trustee-plaintiff did not have standing to bring fraud claims assigned to him by creditors pursuant to a confirmed plan.  They argued such assignments of claims were prohibited under Nevada law, which governed the plan under its choice

---

[34]  *Id.* at 458 ("As we have already noted, however, Appellees point to no state law bar to the assignment of the [creditor] claims to [the plan disbursing agent].").

[35]  414 F.3d 507 (4th Cir. 2005).

[36]  *Id.* at 516 ("This analysis, however, is predicated entirely on the assumed validity of the assignments, a proposition we accept in viewing the complaint in the light most favorable to the trustee.").

[37]  *In re Agribiotech, Inc.*, 319 B.R. 207 (D. Nev. 2004).

of law provision. Caught between two inconsistent provisions, the court, in an effort to maintain the expectations of the parties under the confirmed plan, found that the provisions in the plan relating to the assignment of claims prevailed over the choice of law provision. In affirming the bankruptcy court's finding that the trustee had standing to assert the assigned claims notwithstanding the state law prohibition, the district court found the resolution was neither clearly erroneous nor manifestly unjust, and presented the same policy arguments found in *In re CBI Holding* and *In re Bogdan* (which do not address state law prohibitions against assignment of claims). The Court finds that the confirmed plan approving the assignments was the primary driver of the ruling in *In re Agribiotech* and that consideration of the assignment issue was peripheral.

In summary, Malloy seeks a broad declaration by this Court that § 541(a)(7) of the Bankruptcy Code and/or federal common law preempts any state law that might restrict the assignment of a cause of action to a bankruptcy trustee. In support of his federal preemption argument, Malloy relies on *FDIC v. Bank of Boulder*.[38] The court in *Bank of Boulder* addressed whether the *FDIC as a corporation* could purchase a letter of credit from the *FDIC as receiver* in the course of a purchase and assumption transaction, notwithstanding that the letter was nontransferable under applicable state law.[39] The court found that the federal statute governing the

---

[38]  911 F.2d 1466, 1469 (10th Cir. 1990).

[39]  Trustee characterizes this case as holding "that tort claims could be assigned to a receiver appointed by the FDIC after a bank takeover despite Colorado's anti-assignment laws." *Amended Second Corrected Trustee's Combined Response to Objections to Trustee's Motion to Settle with the United States filed by the Debtor, Commerce Bank, and Amy Gordon, Docket No. 219*, at 16 (emphasis added). While such a holding might have been beneficial to Trustee's current case, courts decide real disputes, and real disputes are fact driven. Put another way, this Court relies heavily upon the facts of a particular case in determining the applicability of that case to the cases it must decide. *Bank of Boulder* deals exclusively with the transfer/assignment of letters of credit among FDIC entities. It has nothing to do with tort claims.

FDIC purchase and assumption procedure *specifically allowed for the transaction in question*, and that federal law would preempt the state statute in that instance.[40]  Malloy is effectively asking the Court to undertake an analysis of § 541(a)(7) and find that it preempts any Oklahoma state law that might limit or restrict his acceptance of the Assigned Claims.  The Court finds that Malloy's request is both premature, because no showing has been made that there is an actual conflict with Oklahoma law, and misplaced, as this is not the proper venue to address the question of standing in future litigation.

Unlike state law in the cases cited by Malloy, Oklahoma law prohibits the assignment of certain causes of action.  The parties agree that the following statutes address the assignability of causes of action in Oklahoma:

12 Oklahoma Statutes § 2017(D)

> ASSIGNMENT AND SUBROGATION OF CLAIMS.  The assignment of claims not arising out of contract is prohibited.  However, nothing in this section shall be construed to affect the law in this state as relates to the transfer of claims through subrogation.[41]

60 Oklahoma Statutes § 312

> A thing in action is a right to recover money or other personal property, by judicial proceedings.[42]

60 Oklahoma Statutes § 313

> A thing in action, arising out of the violation of a right of property,

---

[40]  *Bank of Boulder*, 911 F.2d at 1472–73 ("Thus, we hold that section 1823(c)(2)(A) creates a power in FDIC/Corporation to purchase any assets, including assets nontransferable under state law, from FDIC/Receiver in order to facilitate a P & A transaction.").

[41]  Okla. Stat. tit. 12, § 2017(D) (Referred to as the "Real Party in Interest" statute.  *See Skycam, Inc. v. Bennett*, 2011 WL 3293015 (N.D. Okla. Aug. 1, 2011)).

[42]  Okla. Stat. tit. 60, § 312.

or out of an obligation, may be transferred by the owner. Upon the death of the owner, it passes to his personal representatives, except where, in the case provided by law, it passes to his devisees or successors in office.[43]

The seminal case regarding assignability of a cause of action under Oklahoma law is *Momand v. Twentieth-Century Fox Film Corp.*[44]  *Momand* addressed whether causes of action created and granted by the Sherman Anti-trust Act (a Federal statute) were legally assignable under Oklahoma law.  *Momand* stands for the proposition that state law governing the assignability of causes of action applies, even where the action grows out of a Federal statute.[45]  The significance of *Momand* is that it presents a framework whereby courts should 1) determine the nature, type, kind, and class of a cause of action, using Federal decisions where the cause of action is created under Federal law (and, by implication, using state decisions where the cause of action is created under state law);  2) determine what nature, type, and class of action the assignment of which is permitted or prohibited under the laws of Oklahoma;[46] and 3) determine whether the cause of action at issue falls into the prohibited category.[47]  The record before the Court does not include sufficient information regarding

---

[43]  Okla. Stat. tit. 60, § 313.

[44]  37 F. Supp. 649, 657 (W.D. Okla. 1941).

[45]  *Id.* at 656.

[46]  Oklahoma law draws a line between "tort pure and simple" and "tort that arises out of contract, express or implied."  *See Skycam, Inc. v. Bennett*, 2011 WL 3293015 (N.D. Okla. Aug. 1, 2011); *Kansas City, M. & O. Ry. Co. v. Shutt*, 104 P. 51, 24 Okla. 96 (OK 1909) (Court found legislative intent to restrict assignment of choses in action to those arising out of contract, and inferred that a chose in action arising out of pure tort is not assignable.); *Chimney Rock Ltd. P'ship v. Hongkong Bank of Canada*, 857 P.2d 84 (Okla. Civ. App. 1993).

[47]  *Momand*, 37 F. Supp. at 657–58.

the specific causes of action being assigned to Malloy by the Investors.[48]   The Court is unable to carry out the analysis required under the first prong of the *Momand* test.   In the absence of information regarding the nature and source of the causes of action at issue, the Court cannot determine whether Oklahoma law would prohibit their assignment, and thus whether there are any preemption issues presented.[49]

Even if the record were complete regarding the claims that Malloy intends to bring against Commerce (or any other party, for that matter), this Court would leave the issue to the court where the matter will be tried.   The time for the issue of Malloy's standing to be determined is when he files his complaint, and the place to determine the issue is in the court where litigation is commenced.[50]  This decision is consistent with the authority cited by Malloy.  In each of those cases, standing was determined within the context of litigation of the assigned claims, and not by another court.   Once Malloy files his cause of action, the court where the action is filed should have a full understanding of the nature of the claims asserted.   That court will be in the best position to

---

[48]  *See supra* note 18.

[49]  As noted *infra*, this Court is leaving the issue of Malloy's standing to the court where that litigation is brought.  Any pronouncements of this Court regarding *Momand* are not intended to be binding.

[50]  Although it is theoretically possible that Malloy will file actions against parties other than Commerce (and perhaps some of its employees), it does not appear likely.  Malloy has stated that the statute of limitations on any claims he might bring expires on January 7, 2013. *See Docket No. 327*.  It seems logical that if Malloy had other claims against other entities, they would be subject to the same bar date, and would have been disclosed at the same time Malloy disclosed his intent to sue Commerce.  Time will tell.  In any event, the Court has nothing before it that would describe any claims Malloy may have or claim to have against anyone other than Commerce, and the Court is thus unable to review any such claims.

determine whether the claims asserted are assignable.[51]

*Interests of Creditors*

Notice of the CA was sent to all creditors and parties in interest in Debtor's bankruptcy case. Three objections were filed.  One was stricken because the objecting party (the Debtor) lacked standing to object.  Another was settled.  The only remaining objection is that of Commerce.  Two questions must be addressed here: whether the objection filed by Commerce is reflective of a reasonable creditor's position, and whether an objection by a single creditor is enough to doom a proposed compromise.

It is nearly impossible to look at the record and conclude the opposition of Commerce to the CA is driven by its status as an unsecured creditor.  Unsecured creditors want to get paid. They ordinarily spend little money in bankruptcy litigation, as the potential returns do not justify the expense.[52]  On the other hand, targets of litigation ordinarily do not wish to be sued, and explore every possible means of avoiding litigation or bringing it to an end.  Commerce is no exception to the rule.  While the substance of Commerce's legal arguments are to be considered, its view that the

---

[51]  The ruling also allows the Court to escape the jurisdictional minefield that exists as a result of the Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011).

[52]  Consider the following: not including the $43 million claim of the USA, there are over $30 million in claims filed in this case.  Commerce has filed a claim for approximately $470,000, representing less than 1.6% of the total dollar amount of claims in the case (obviously, if the USA claim of $43 million is included, the proportional amount of Commerce' claim drops precipitously).  If Malloy recovers $1 million and the USA claim is not included in the claims distribution, Commerce stands to receive less than $15,500 from the bankruptcy estate.  If the USA claim is included in the calculation, the number drops to less than $6,500.  A cursory review of the docket sheet in this case reveals that Commerce has spent multiples of either sum in opposing the CA.  If one considers Commerce solely as a creditor, this makes no economic sense.  If one considers Commerce as a target of litigation, Commerce's vigorous opposition to the CA comes into much sharper focus.  If the CA is not approved, Malloy will not be able to bring millions of dollars in claims against Commerce.

19

CA should not be approved shall be given no deference.

When a court has determined that a proposed settlement falls within the range of reasonableness, an objection by a single creditor does not warrant disapproval of the settlement.

> There is no *per se* rule that the views of a committee or other creditors are dispositive on the reasonableness of a settlement. A *per se* rule would unduly expose the Debtors to the demands of creditors preferring to risk estate assets in a litigation lottery or litigate under blackmail or strong-arm strategies. Instead, a debtor may seek approval of a settlement over major creditor objections as long as it carries its burden of establishing that the balance of the *Martin* factors, including the paramount interests of creditors, weighs in favor of settlement.[53]

Where a trustee has met his or her burden regarding the reasonableness of a settlement, an objection of a single creditor motivated by that creditor's status as a target of litigation is not a sufficient basis for disapproval of a compromise.

One area regarding the claim filed by the USA needs to be addressed. In testimony at the hearing on approval of the CA, Malloy stated that, under the CA, the USA will be entitled to a distribution from the estate without regard to the proof of claim filed in the case.[54] Malloy appears to contend that approval of the CA validates the claim of the USA or, in the alternative, establishes a right of the USA to receive distributions from the estate based upon its forfeiture judgment of $43,609,877.44.[55]

Fortunately for Malloy, the terms of the CA, and not his testimony, control. The CA says nothing about claims allowance. It states that "<u>Malloy</u> is hereby barred from asserting, or assisting

---

[53] *In re Capmark Fin. Group, Inc.*, 438 B.R. 471, 519 (Bankr. D. Del. 2010) (and cases cited therein).

[54] *Transcript of Proceedings Held on October 25, 2012, at Docket No. 320*, Page 31, Line 14 through Page 35, Line 3.

[55] *Exh. CB-18*, Claim No. 8-1.

others in asserting, any claim against the [USA] . . . in connection with or arising out of the seizure or forfeiture of Gordon's assets[.]"[56] Read liberally, the statement means, at most, that Malloy will not object to the USA claim.  The decision whether to object to a claim is well within Malloy's sound judgment, CA or no CA.  The Court will not question or seek to disturb that judgment on the facts presently before it.  The CA does not purport to upset the claims allowance process of this Court, nor does it seek to unconditionally allow the USA claim.  If it did, it would be summarily disapproved.

The Court finds that approval of the CA under the terms stated herein is in the best interests of creditors and the bankruptcy estate.  It eliminates the potential for future litigation between Malloy and the USA.  It allows the forfeiture actions brought against Gordon by the USA and the collection efforts in this bankruptcy case to operate in harmony instead of at cross purposes.  It saves time and money.  The rights of Commerce remain unaltered.  Malloy's standing to sue Commerce will be addressed in any litigation that Malloy chooses to bring against Commerce, by the court where that litigation will take place.

*Approval of the CA by the District Court*

The scope of this Court's inquiry is limited to whether Malloy should be authorized to enter into the CA.  The Court notes that, in every case cited to it by Malloy, the appropriate federal district court was advised of and approved the proposed CA.  This Court offers no opinion on whether entry into the CA by the USA is subject to the approval of the District Court.  Nothing in this Memorandum Opinion or accompanying Order is intended to or shall be construed as an attempt to bind or influence the District Court in any way, shape, or manner with respect to the CA.  As a

---

[56] *Exh. A.*

courtesy to the District Court, copy of this Memorandum Opinion shall be provided to the Honorable James H. Payne, United States District Judge.

## Conclusion

Malloy is authorized to enter into the CA.  This Court makes no finding regarding the validity of the assignments authorized under the CA, leaving that issue to the court or courts ultimately responsible for any such litigation.  The approval is without prejudice to any other party with standing to contest the claim filed by the USA at the time such dispute may ripen.

A separate order consistent with this Memorandum Opinion is entered concurrently herewith.

Dated this 4th day of January, 2013.

BY THE COURT:

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

6448.8